**UNITED AIRLINES, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (GANE), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 30, 2012.

Decided April 23, 2012.

David R. Kunz, Philadelphia, for petitioner.

Gregory J. Boles, Philadelphia, for respondent Daniel Gane.

BEFORE: PELLEGRINI, President Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY President Judge PELLEGRINI.

United Airlines (United) petitions for review of an order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) granting Daniel Gane's (Claimant) petition to review compensation benefit offset (review petition). For the reasons that follow, we affirm the Board.

On February 5, 1997, Claimant injured his left shoulder while working for United. United issued a notice of compensation payable describing the injury as a left shoulder strain[1] and providing for workers' compensation benefits of $542 based on Claimant's average weekly wage of $718.01. When Claimant retired on June 3, 2003, he began receiving pension benefits under United's defined-benefit, noncontributory pension plan. United filed a notice of workers' compensation benefit offset (offset notice) indicating that Claimant's workers' compensation benefits would be completely offset by his receipt of pension benefits because it fully funded the pension.

In May 2005, because of United's Chapter 11 bankruptcy reorganization, the United States Federal Pension Benefit Guarantee Corporation (PBGC)[2] terminated United's pension plan and became trustee of the plan. Because the pension plan was underfunded, PBGC reduced Claimant's pension benefits from $2,418.75 to $1,934.89. Claimant then filed a review petition claiming United had been underpaying his workers' compensation benefits since November 2005 because it was offsetting a greater percentage of the funds than it was entitled to offset.[3]

In support of his review petition, Claimant submitted the testimony of Stephen H. Rosen (Rosen), an actuary and certified pension consultant. Rosen testified that when United declared bankruptcy, PBGC took over United's pension plan. He explained that PBGC is funded with premiums paid by all pension plans and assets that it acquires when it takes over underfunded pension plans, and that all transferred assets acquired by PBGC are managed on a pooled basis relative to the

---

1. The injury was subsequently expanded to include pain disorder, dysthemic disorder, herniated discs at C3–4 and C4–5, rotator cuff impingement on the left side with aggravation and protruding disc at C5–6. (January 28, 2009 WCJ Decision, Finding of Fact No. 1).

2. Title IV of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1301–1310, created the Pension Benefit Guaranty Corpora-

tion—"a wholly owned United States Government corporation, modeled after the Federal Deposit Insurance Corporation." *PBGC v. LTV Corp.*, 496 U.S. 633, 636–37, 110 S.Ct. 2668, 2670–71, 110 L.Ed.2d 579 (1990).

3. Claimant also filed a petition for penalties and another review petition alleging an incorrect weekly pension offset, but those matters have been resolved and are no longer at issue.

liabilities that it accepted. Rosen opined that at the time of the bankruptcy, United's pension plan was only 32% funded based on accrued liabilities, or approximately $2.8 billion underfunded. Because United only funded 32% of Claimant's pension, rather than the 100% it funded before it went into Chapter 11, Rosen opined that with the new offset calculated on United's 32% funding of Claimant's pension, Claimant was entitled to receive workers' compensation benefits in the amount of $542 per week.

In opposition to Claimant's review petition, United presented the testimony of Deborah Reskey (Reskey), its manager for benefit compliance. Reskey testified that prior to the transfer of the plan to PBGC, Claimant had been receiving a gross monthly benefit of $2,418.75. Of that amount, $406.32 was paid by Metropolitan Life (MetLife) through a purchased annuity and $2,012.43 was paid by United through Northern Trust Bank. (Apparently United was making up the difference out of its current earnings.) She testified that all the assets of the United pension fund were transferred to PBGC, which then assumed liability for the pension to be paid. She testified that additional money for the United pensions, as well as other pensions it assumed because of bankruptcy, were funded by a charge placed on other non-bankrupt pension funds that PBGC insured.

Leo Turcotte, Ph.D. (Dr. Turcotte), a Senior Economist for the Center for Forensic Economic Studies, testified that United's plan was a defined-benefit plan which, prior to its termination, was funded entirely by United without any contributions from employees. He testified that he assumed that if United's pension fund was insufficient to pay the pensions for that year, United would pay yearly an amount sufficient to cover pensions for that year.

He confirmed the amounts stated by Reskey and further testified that pursuant to the settlement agreement between United and PBGC, PBGC reduced United's portion of the pension benefits to $1,528.57 per month, thereby reducing Claimant's total pension benefits to $1,934.89 per month. He also testified that once PBGC took over the pension plan, it assumed all of United's pension liabilities, leaving United with no further obligation to the pensioners or to PBGC.

The WCJ found that the credible testimony of the witnesses established that prior to May 11, 2005, that the pension plan was funded entirely by United without any contributions from Claimant; that from June 3, 2003 to May 11, 2005, United was entitled to a 100% offset against Claimant's workers' compensation benefits; and that PBGC terminated United's pension plan on May 11, 2005. With regard to Rosen's testimony regarding an alternative benefit offset calculation, the WCJ stated:

This Judge has carefully reviewed the testimony of Stephen Rosen and finds that it is credible or persuasive but not on the issue of supporting a specific alternative benefit offset calculation to be taken by United against Claimant's workers' compensation benefits. Although Mr. Rosen is an actuary, he admits in his testimony that he did not do specific calculations to arrive at his posited offset figure but rather took the figure used in the documents that he reviewed. In that regard his testimony is speculative as to the calculation of the offset. He also admits that it is difficult to come to an actual value of the contribution that United made to have PBGC assume its pension's assets and liabilities because the market value of the transfers would be hard to calculate. In this regard his testimony is speculative as to the calculation of the offset.

(January 28, 2009 WCJ Decision, Finding of Fact No. 10). With regard to United's expert testimony on how the offset should be calculated, the WCJ stated:

This Judge finds further that their testimony is not persuasive on what, if any, benefit calculation should be used to offset Claimant's workers' compensation benefits.

(*Id.*, Finding of Fact No. 14). The WCJ further found that after May 11, 2005, "United did not prove its contribution, either per employee or by actuarial testimony." (*Id.*, Finding of Fact No. 17). However, the WCJ went further and found that in no event would United be entitled to an offset, finding:

[B]y virtue of declaring bankruptcy and by the PBGC's takeover of United's pension plan, United no longer has a pension plan, pension plan assets or any liability associated with the payment of benefits. United has no future liability with regard to Claimant's pension. PBGC has all the funding and benefit liability and can and has even changed Claimant's benefit amount.

(*Id.*, Finding of Fact No. 13). Accordingly, the WCJ granted Claimant's review petition and ordered United to pay Claimant compensation benefits at the rate of $542 per week from May 11, 2005, with interest of 10% per annum on all past-due compensation.

United appealed to the Board, arguing that the WCJ erred by (1) failing to allow it to take an offset for the separate MetLife pension annuity; (2) determining that

it was not entitled to an on-going offset; and (3) determining that the pension funds were commingled.[4] The Board held that "[w]hile we agree with the WCJ regarding the resolution of the pension plan taken over by PBGC, it appears that [United] also may have a smaller plan that was funded by [United] and paid for by MetLife." (August 24, 2009 Board Decision at 5). Accordingly, the Board remanded to the WCJ to address or provide clarification regarding the effect, if any, of the MetLife annuity on United's offset request.

■ Following remand, the parties stipulated that as of the October 30, 2003 effective date of United's offset notice, United was entitled to an offset for the MetLife annuity in the amount of $406.32 per month, or $93.62 per week, against ongoing benefits paid to Claimant. The WCJ adopted the parties' stipulation in her Findings of Fact and issued an order granting the stipulated offset. United again appealed the remaining issues to the Board, which affirmed the WCJ. This appeal by United followed.[5]

■ United contends that the WCJ erred in not granting it an offset for its pension fund payments just because PBGC terminated its pension plan and became responsible for payment of its pension obligations. It argues that it should be permitted to take an offset for the pension payments from the PBGC plan because United fully funded the pension before PBGC took over the obligation for payment of the pension. United also argues that there was not substantial evidence to

---

**4.** The WCJ found that as a result of the termination, United's "assets and financial and securities instruments were mixed with all assets from premium paying employers nationwide as well as the assets from other pension plans that had to be taken over." (January 28, 2009 WCJ Decision, Finding of Fact No. 12).

**5.** Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence and whether constitutional rights were violated. *Sysco Food Services of Philadelphia v. Workers' Compensation Appeal Board (Sebastiano)*, 940 A.2d 1270 (Pa. Cmwlth.2008).

support the WCJ's finding that United's pension funds were "commingled" in such a fashion that its offset should be terminated completely.

The initial question in this appeal is whether a pension plan previously funded by an employer is entitled to an offset under Section 204(a) of the Workers' Compensation Act (Act)[6] once the employer's plan is taken over by the PBGC. Section 204(a) provides, in relevant part, that:

> The severance benefits paid by the employer directly responsible for the payment of compensation and *the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award* made under sections 108 and 306, except for benefits payable under section 306(c).

77 P.S. § 71 (emphasis added).[7]

Under Section 204(a) then, an offset is given for pension benefits, *to the extent funded by the employer.* To receive an offset, there is no requirement that employer be liable for payment of the pension. That the funds it contributed are commingled in a pension fund with money paid by other employers, or that the fund was taken over by the PBGC, is of no effect. In other words, the key inquiry is the extent to which the employer funded an employee's pension, not who is liable for payment. To the extent that an employer can establish that it funded a pension plan, it is entitled to an offset, regardless of whether the PBGC has taken over the plan and assumed liability for it.

■ The extent to which an employer can take an offset is set forth in the Act's associated regulations relating to the calculation of offsets when the pension benefit is payable from a multi-employer pension plan. The regulations provide, in relevant part:

> To calculate the appropriate offset amount, the portion of the annuity purchased by the liable employer's contributions shall be as determined by the pension fund's actuary. The ratio of the portion of the annuity purchased by the liable employer's contribution to the total annuity shall be multiplied by the net benefit received by the employee from the pension fund.

34 Pa.Code § 123.10(b).

In this case, even though Claimant filed the petition to review the offset, because United is the party seeking to receive the offset and its Chapter 11 bankruptcy changed the status quo, it has the burden to establish the amount of the offset. *Department of Public Welfare v. Workers' Compensation Appeal Board (King),* 884 A.2d 343, 347 (Pa.Cmwlth.2005). Although United offered expert testimony on the issue, the WCJ specifically found that its testimony was not persuasive on what benefit offset calculation should be used and that United failed to prove its post-May 11, 2005 contribution per employee or by actuarial testimony.[8] Because of the ab-

---

**6.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 71.

**7.** In *The Pennsylvania State University v. Workers' Compensation Appeal Board (Hensal),* 911 A.2d 225 (Pa.Cmwlth.2006), we explained the purpose of Section 204(a), noting that it "serves the legislative intent of reducing the cost of workers' compensation by allowing an employer to avoid paying duplicate benefits from the same loss of earnings." *Id.* at 227–228.

**8.** Ironically, Claimant was the only party to offer testimony as to what extent United funded his pension, as his expert opined that United's contribution funded 32% of his pension. However, that testimony was also found not credible.

sence of any credible testimony regarding the extent to which the employer funded Claimant's pension, United is not entitled to an offset.

Accordingly, we affirm, *albeit* on a different basis, the order of the Board.

## ORDER

AND NOW, this 23rd day of April, 2012, the order of the Workers' Compensation Appeal Board, dated September 23, 2011, at No. A10–1419, is affirmed.