IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Thomas A. England, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Merion Construction, M. Schnoll & | : | |
| Sons, Schnoll Painting, SeaBright | : | |
| Insurance and New Hampshire | : | |
| Insurance (Workers' Compensation | : No. 304 C.D. 2021 | |
| Appeal Board), | : No. 305 C.D. 2021 | |
| Respondents : | Argued: May 8, 2024 | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE WALLACE                                   FILED: August 7, 2024


In these consolidated matters, Thomas A. England (Claimant) petitions for review of the February 19, 2021 order of the Workers' Compensation Appeal Board (Board). The Board affirmed two decisions of the Workers' Compensation Judge (WCJ), circulated July 29, 2019, and August 26, 2019. In relevant part, the WCJ concluded (1) M. Schnoll & Sons (Schnoll) was Claimant's employer directly liable for the payment of compensation because it purchased Workers' Compensation (WC) insurance from SeaBright Insurance (SeaBright), (2) Merion Construction (Merion) and New Hampshire Insurance (New Hampshire) were not liable for the

payment of compensation and should not be joined, (3) Schnoll was entitled to a pension offset in the amount of $133.47 per week as of March 1, 2011, (4) Claimant had an earning power of $1,346 per week as of November 12, 2016, resulting in a weekly compensation rate of $229.45, and (5) Claimant voluntarily withdrew from the workforce as of January 9, 2018, entitling Schnoll to suspension of his wage loss benefits. After careful review, we affirm.

## BACKGROUND

Claimant injured his left knee on August 11, 2010, while working as a union painter for Schnoll. *See* WCJ Decision (Dec.), 7/29/19, Findings of Fact (F.F.) ¶¶ 1, 32-33. Merion was the general contractor for the project where Claimant was injured, and Schnoll was a subcontractor. *Id.* Claimant explained he was "walking down a hallway backward, spraying the walls when he struck his heel on the spray housing and got tangled up, hyperextending his leg." WCJ Dec., 12/1/16, F.F. ¶ 9. A notice of compensation payable was issued, accepting liability for a torn meniscus.[1] Claimant began receiving total disability benefits at the rate of $845 per week based on an average weekly wage of $1,690. *Id.*, F.F. ¶ 1. Claimant filed a review petition, which the WCJ granted by decision circulated March 28, 2012, concluding the work injury "include[s] an aggravation of the patellofemoral degenerative arthritis in the left knee." *Id.*

---

[1] The notice of compensation payable, along with other documents filed during the early years of the case, referred to Claimant's employer as "Merion Construction/M. Schnoll and Sons, Inc." *See, e.g.*, Ex. D-03 (A19-0760) (notice of compensation payable attached as an exhibit to Schnoll's brief); Ex. J-01 (A19-0760) (WCJ Decision circulated March 28, 2012). The law firm that defended the case on behalf of "Merion Construction/M. Schnoll and Sons, Inc." currently represents Schnoll, Schnoll Painting, and SeaBright, while Merion has separate counsel.

**A. Docket number A19-0854**

Claimant's case then proceeded along two different docket numbers. Pertinently, Schnoll filed a modification petition on February 18, 2013, alleging Claimant had an earning power of at least $520 per week based on a transferable skills analysis and labor market survey by vocational expert Michael Smychynsky (Smychynsky). Claimant filed an answer on April 8, 2013, denying Schnoll's allegations. In addition, Claimant filed a review petition on May 29, 2013, alleging Claimant's work injury should be expanded to include low back and groin pain.

The WCJ issued a decision, circulated December 1, 2016, granting Schnoll's modification petition and directing Claimant receive benefits at a partial disability rate of $780.39 per week from February 11, 2013, until September 17, 2013, and beginning again on November 19, 2013, based on earning power of $520 per week. WCJ Dec., 12/1/16, F.F. ¶ 34, Conclusion of Law (C.L.) ¶ 2. The WCJ also granted Claimant's review petition in part, concluding he suffered a "lumbar sprain and strain as a result of his altered gait due to the left knee injury that was fully resolved as of November 19, 2013." *Id.*, F.F. ¶ 35, C.L. ¶ 3. The WCJ directed that Claimant be reimbursed for his fair and reasonable litigation costs of $9,087.20. *Id.*, F.F. ¶ 37, C.L. ¶ 8.

In reaching this decision, the WCJ rejected Claimant's testimony that he could not perform the jobs Smychynsky identified in the labor market survey, reasoning Claimant had the appropriate educational background and volunteered with a youth wresting club, which demonstrated administrative skill and the ability to interact with others. WCJ Dec., 12/1/16, F.F. ¶¶ 9, 24. The WCJ pointed to the testimony of Claimant's medical expert, Robert Mannherz, M.D., who opined Claimant could perform sedentary work on a part-time basis, and to surveillance video showing

Claimant could perform physical activities such as snow removal. *Id.* ¶¶ 14, 18-19, 24, 27, 31. The WCJ rejected Claimant's assertion that taking the jobs Smychynsky identified would result in the loss of union benefits. *Id.* ¶¶ 9, 24. In this regard, the WCJ credited the testimony of Michael Thurman (Thurman), Schnoll's general superintendent and vice president, who testified a union painter could also perform "a concurrent non-union job," so long as it was not a job competing against union painting business. *Id.* ¶¶ 13, 24, 29.

Claimant and Schnoll appealed to the Board, which affirmed the WCJ in part and remanded in part by opinion mailed December 6, 2017. The Board affirmed the WCJ's decision to grant Schnoll's modification petition, including his finding that Claimant had an earning power of $520 per week and would not lose union benefits by accepting a job Smychynsky identified in the labor market survey. Bd. Op., 12/6/17, at 6-8. The Board concluded Claimant was entitled to litigation costs with respect to matters that were finally determined in his favor. *Id.* at 10-11. However, the WCJ awarded Claimant the full amount of his litigation costs, including costs relating to matters on which he did not succeed. *Id.* The Board remanded for the WCJ to award costs limited to Claimant's partly-successful review petition.[2] *Id.* at 11. The WCJ issued a decision on remand, circulated August 26, 2019. The WCJ found a total of $1,291.50 in litigation costs were attributable to Claimant's review petition. WCJ Dec., 8/26/19, F.F. ¶¶ 5-6. Claimant and Schnoll appealed to the Board a second time.

---

[2] Claimant filed a petition for review in this Court. On February 1, 2018, we dismissed Claimant's petition as taken from an interlocutory order. *England v. Workers' Comp. Appeal Bd. (Merion Constr.)* (Pa. Cmwlth., No. 16 C.D. 2018, filed Feb. 1, 2018) (Oler, S.J.) (single-judge order).

4

## B. Docket number A19-0760

Meanwhile, Schnoll filed a petition to modify or suspend Claimant's WC benefits on July 29, 2014. Schnoll based its petition on Claimant's receipt of a union disability pension. Claimant filed an answer on August 6, 2014, admitting Schnoll was "entitled to some measure of pension benefit offset" but demanding strict proof of the appropriate calculations. Answer, 8/6/14. Claimant filed an amended answer on January 27, 2016, demanding "strict proof of the identity of the legal entity directly liable for payment of compensation" through the insurance policy paying Claimant's WC benefits. Am. Answer, 1/27/16 (quotation marks omitted). Claimant averred the employer directly liable for the payment of compensation was not Schnoll but Merion, which had "contractually agreed to serve as statutory employer, and therefore any pension credit is limited to contributions made by Merion." *Id.*

Schnoll filed a second modification petition on November 15, 2016, based on Claimant's alleged earning power of $1,346 per week.[3] Claimant filed an answer on November 30, 2016, denying Schnoll's allegations. He insisted Schnoll's petition was based on a two-year-old independent medical examination and lacked recent supporting evidence. On January 6, 2017, Claimant filed a petition to join Merion as an additional employer and New Hampshire as an additional insurer. New Hampshire filed an answer on January 31, 2017, denying Claimant "sustained a work-related injury or material aggravation while employed with [Schnoll]." Answer, 1/31/17.

Further, Schnoll filed a petition to suspend Claimant's WC benefits on January 23, 2018, based on the allegation that Claimant had voluntarily withdrawn

---

[3] Although not stated in the petition, Schnoll relied on an additional labor market survey by Smychynsky.

from the workforce. Schnoll cited Claimant's testimony during a deposition on January 9, 2018, that he did not intend to return to work. Additionally, Schnoll cited the WCJ's December 1, 2016 order at docket number A19-0854, concluding Claimant was capable of returning to work and rejecting his assertion that returning to work would cause him to lose union benefits. Claimant filed an answer on February 6, 2018, denying that he voluntarily withdrew from the workforce. On May 4, 2018, Claimant filed a review petition alleging Schnoll had no basis for taking a "unilateral pension benefit offset." Pet. to Rev. Comp. Benefit Offset, 5/4/18. Claimant filed a penalty petition that same day, based on Schnoll's alleged failure to establish a basis for its pension offset. Schnoll filed answers on May 7, 2018, generally denying Claimant's allegations.

The WCJ circulated a decision on July 29, 2019, granting Schnoll's modification and suspension petitions and denying Claimant's joinder, review, and penalty petitions. The WCJ concluded Schnoll purchased WC insurance for Claimant from SeaBright through Merion's contractor-controlled insurance program (CCIP) and, therefore, was the employer directly liable for the payment of compensation. WCJ Dec., 7/29/19, F.F. ¶¶ 18, 28, 32, C.L. ¶ 2. The WCJ reasoned Merion and New Hampshire were not liable for the payment of compensation and should not be joined. *Id.*, F.F. ¶ 33, C.L. ¶ 2. Moreover, the WCJ concluded Schnoll presented substantial, competent evidence to establish (1) it was entitled to a pension offset in the amount of $133.47 per week as of March 1, 2011, (2) Claimant had an earning power of $1,346 per week as of November 12, 2016, resulting in a weekly compensation rate of $229.45, and (3) Claimant voluntarily withdrew from the workforce as of January 9, 2018, entitling Schnoll to suspension of his wage loss benefits. *Id.*, F.F. ¶¶ 25-26, 30, C.L. ¶¶ 3-5. Claimant appealed to the Board.

6

**C. Claimant's petition for review**

The Board affirmed the WCJ's August 26, 2019 and July 29, 2019 decisions by opinion and order mailed February 19, 2021. Claimant filed petitions for review in this Court. Claimant now argues Merion was the employer directly liable for the payment of compensation, rather than Schnoll, and Schnoll was not entitled to a pension offset. Claimant challenges the amount of Schnoll's petition offset and the WCJ's findings that he voluntarily removed himself from the workforce and had an earning power of $1,346 per week. Finally, Claimant argues the WCJ did not issue a reasoned decision and maintains he was entitled to unreasonable contest attorney's fees and penalties.

## DISCUSSION

This Court reviews WC orders for violations of the petitioner's constitutional rights, violations of agency practice and procedure, and other legal errors. 2 Pa.C.S. § 704. Further, we review whether substantial evidence supports the findings of fact necessary to sustain a decision. *Id.* The WCJ is the fact-finder in WC cases and is entitled to weigh the evidence and determine the credibility of witnesses. *Montano v. Advance Stores Co., Inc. (Workers' Comp. Appeal Bd.)*, 278 A.3d 969, 978 n.4 (Pa. Cmwlth. 2022) (citing *Sharkey v. Workers' Comp. Appeal Bd. (Fed. Express)*, 786 A.2d 1035, 1038 (Pa. Cmwlth. 2001)). We must view the evidence in the light most favorable to the party that prevailed before the WCJ and draw all reasonable inferences in support of the WCJ's decision. *Id.*

**A. Claimant's liable employer**

Claimant argues first that Merion, rather than Schnoll, is the employer directly liable for the payment of compensation under Section 204(a) of the Workers'

Compensation Act (Act).[4] Claimant's Br. at 19-33. Because of this, Claimant maintains, Schnoll was not entitled to an offset based on his pension benefits. *Id.* at 30-31. Claimant relies on Section 302(a)-(b) of the Act,[5] arguing Merion was the general contractor for the project where he was injured. *Id.* at 19-22, 25. Claimant contends Merion provided WC insurance for Schnoll through the CCIP, which was mandatory for all subcontractors working on the project, and paid premiums and deductibles for the policy. *Id.* at 22-29.

Section 204(a) provides as follows:

(a) No agreement, composition, or release of damages made before the date of any injury shall be valid or shall bar a claim for damages resulting therefrom; and any such agreement is declared to be against the public policy of this Commonwealth. The receipt of benefits from any association, society, or fund shall not bar the recovery of damages by action at law, nor the recovery of compensation under article three hereof; and any release executed in consideration of such benefits shall be void: . . . Provided, however, That . . . **the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award** made under sections 108 and 306, except for benefits payable under section 306(c). The employe shall provide the insurer with proper authorization to secure the amount which the employe is receiving under the Social Security Act.[6]

77 P.S. § 71(a) (emphasis added).

Our General Assembly added Section 204(a)'s pension offset in 1996 to "combat the increasing costs of [WC]." *Pa. State Univ. v. Workers' Comp. Appeal Bd. (Hensal)*, 911 A.2d 225, 227 (Pa. Cmwlth. 2006) (*en banc*) (citing *Kramer v.*

---

[4] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 71(a).

[5] 77 P.S. §§ 461-62.

[6] 42 U.S.C. §§ 301-1397mm.

*Workers' Comp. Appeal Bd. (Rite Aid Corp.)*, 883 A.2d 518 (Pa. 2005)). As this Court has explained, Section 204(a) now "serves the legislative intent of reducing the cost of [WC] by allowing an employer to avoid paying duplicate benefits for the same loss of earnings. Similarly, Section 204(a) implicitly recognizes that public policy bars an employer from utilizing an employee's own retirement funds to satisfy its [WC] obligation." *Id.* at 227-28 (citations omitted); *see also Sadler v. Phila. Coca-Cola (Workers' Comp. Appeal Bd.)*, 269 A.3d 690, 704 (Pa. Cmwlth. 2022).

Section 302(a) provides, in relevant part:

> A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor **unless the subcontractor primarily liable for the payment of such compensation has secured its payment** as provided for in this act. Any contractor or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from the subcontractor primarily liable therefor.

77 P.S. § 461 (emphasis added).

The relevant portion of Section 302(b) provides:

> Any employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of such employer's regular business entrusted to that employe or contractor, shall be liable for the payment of compensation to such laborer or assistant **unless such hiring employe or contractor, if primarily liable for the payment of such compensation, has secured the payment thereof** as provided for in this act. Any employer or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from another person if the latter is primarily liable therefor.

77 P.S. § 462 (emphasis added).

9

This language embodies the "statutory employer doctrine," which serves to "place responsibility for payment on the first entity in a contractor chain when an injured employee's direct employer, the subcontractor, fails to secure [WC] insurance." *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 615 (Pa. Cmwlth. 2012) (citing *Six L's Packing Co. v. Workers' Comp. Appeal Bd. (Williamson)*, 2 A.3d 1268, 1272 (Pa. Cmwlth. 2010)). "The Legislature's purpose in imposing this status upon general contractors was remedial, as it wished to ensure payment of [WC] benefits in the event of defaults by primarily liable subcontractors." *Patton v. Worthington Assocs., Inc.*, 89 A.3d 643, 645 (Pa. 2014) (citing *Qualp v. James Stewart Co.*, 109 A. 780, 782 (Pa. 1920)).

The record supports the WCJ's conclusion that Schnoll, rather than Merion, was the employer directly liable for the payment of compensation. The WCJ credited the testimony of Schnoll's Chief Financial Officer, Robert Granato (Granato), who explained Schnoll obtained WC insurance from SeaBright through Merion's CCIP. Notes of Testimony (N.T.), Granato Dep., 10/15/18, at 7-8. He explained Schnoll was "charged via a back charge change order to our contract for the insurance. So if our contract is X amount of dollars, they deduct the cost of the insurance from us." *Id.* at 8-9. Exhibits attached to Granato's deposition include the SeaBright policy information page, which lists Schnoll as the insured, rather than Merion. *Id.*, Ex. Granato-2. Additionally, the subcontractor agreement between Schnoll and Merion includes the following language:

> As of the date hereof, notwithstanding anything to the contrary . . . [Essington Avenue Partners II, L.P.] and Merion have elected to provide insurance coverage for the [p]roject by implementing a [CCIP]. Accordingly, the contractor agrees to accept such CCIP in lieu of the insurance requirements set forth [elsewhere in the contract.] . . . Because this CCIP has been implemented, as provided in the CCIP [m]anual, the applicable cost that [Schnoll] would have incurred in

10

providing insurance . . . as indicated in its bid package shall be deducted from the [c]ontract [s]um.

*Id.*, Ex. Granato-1. The record includes a change order reducing the contract price between Merion and Schnoll by $31,270.31 as a "CCIP Credit."[7] *Id.*, Ex. Granato-3.

Accordingly, Schnoll incurred a reduction in its contract price to obtain WC insurance from SeaBright under the terms of its subcontract with Merion. Although Schnoll obtained WC insurance indirectly through Merion's CCIP, it still "secured [] payment" of Claimant's WC benefits. 77 P.S. §§ 461-62. Claimant's argument depends on the proposition that Section 302 distinguishes between subcontractors that purchase WC insurance directly and those that obtain WC insurance indirectly through the general contractor. Claimant's proposed distinction is not apparent from the language of the Act, however, and we see no reason the General Assembly would have intended to draw such a distinction. In either scenario, the subcontractor would be forced to provide "duplicate benefits for the same loss of earnings" if it did not receive Section 204(a)'s pension credit. *See Hensal*, 911 A.2d at 227.

Claimant cites this Court's decision in *Ace Tire Company v. Workmen's Compensation Appeal Board (Hand)*, 515 A.2d 1020 (Pa. Cmwlth. 1986), arguing Merion was the "first financially responsible contractor" at the project where Claimant was injured and was responsible for paying premiums and deductibles for

---

[7] Claimant directs our attention to an "exclusion of employees" endorsement in the WC insurance policy that provides Merion will be liable for WC benefits "for [Schnoll's] employees engaged in specific operations described in this endorsement when [Schnoll's] employees are covered by [Merion's] policy." Claimant's Br. at 27-28; Ex. C-02 (A19-0760) at 16. The exclusion governs "work conducted at or from: Any location except for [the] project location at 6700 Essington Avenue, Philadelphia . . . and [a p]arking [f]acility." *Id.* Claimant does not allege this requirement was met, nor does our review of the record indicate that it was. Claimant testified his work injury occurred at Essington Avenue. N.T., Claimant Dep., 1/9/18, at 8.

the WC insurance policy. Claimant's Br. at 21-22, 28-29. In *Ace*, Platt Brothers, Inc. (Platt), a general contractor, subcontracted with Ace Tire Company (Ace), which in turn subcontracted with Shelton Excavation Company (Shelton). 515 A.2d at 1021. Platt required Ace to carry WC insurance as part of the subcontract, "although Platt paid the bond and insurance premiums." *Id.* Ace did not require Shelton to carry WC insurance. *Id.* One of Shelton's employees suffered an injury, and this Court held Ace was liable for the employee's WC benefits, explaining: "Platt, the general contractor, avoided its liability by requiring Ace to procure [WC] insurance coverage. Ace could have avoided its liability by requiring Shelton to procure insurance coverage. Ace chose not to do so." *Id.* at 1021-23. Our decision in this case is consistent with *Ace*. Merion required Schnoll to obtain WC insurance under the terms of the subcontract and, like Platt, "avoided its [WC] liability." *See id.* We conclude, therefore, that Schnoll was the "employer directly liable for the payment of compensation" under Section 204(a). *See* 77 P.S. § 71(a).

## B. Schnoll's pension offset

Claimant next challenges Schnoll's $133.47 per week pension offset. He argues the "[a]ctuarial evidence of record" only supports a pension offset of $81.56 per week. Claimant's Br. at 34-37. Nonetheless, Claimant insists the testimony of the pension actuary, James McKeogh (McKeogh), was not credible or competent. *Id.* at 37-38. Claimant argues he worked for two business entities, Schnoll and Schnoll Painting, both of which contributed to his pension. *Id.* at 35-37. Claimant contends he was a W-2 employee of Schnoll at the time of his injury, so only Schnoll's pension contributions should count toward the offset. *Id.* at 35-38. Further, Claimant asserts there should be no pension offset at all because there is no competent evidence to establish Schnoll's or Schnoll Painting's pension

12

contributions. *Id.* at 35, 38-39. If anything, Claimant maintains, Schnoll and Schnoll Painting paid $5,727.41 toward his pension, rather than the $54,860.99 figure used by McKeogh.[8] *Id.* at 35, 39.

As explained above, Section 204(a) provides for an offset based on "the benefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation." 77 P.S. § 71(a). This means Schnoll is entitled to an offset to the extent it funded Claimant's pension. *See United Airlines v. Workers' Comp. Appeal Bd. (Gane)*, 42 A.3d 379, 383-84 (Pa. Cmwlth. 2012); *Gelvin v. Workers' Comp. Appeal Bd. (Pa. State Police)*, 120 A.3d 473, 476-77 (Pa. Cmwlth. 2015). The Bureau of Workers' Compensation regulations provide as follows, with respect to multi-employer pension fund offsets:

> (a) When the pension benefit is payable from a multi-employer pension plan, only that amount which is contributed by the employer directly liable for the payment of [WC] shall be used in calculating the offset to [WC] benefits.
>
> (b) To calculate the appropriate offset amount, the portion of the annuity purchased by the liable employer's contributions shall be as determined by the pension fund's actuary. The ratio of the portion of the annuity purchased by the liable employer's contributions to the total annuity shall be multiplied by the net benefit received by the employee from the pension fund on a weekly basis. The result is the amount of the offset to be applied to the [WC] benefit on a weekly basis.
>
> (c) If the employee receives the multi-employer pension benefit on a monthly basis, the net amount received by the employee shall be multiplied by the ratio of the liable employer's contribution to the pension plan on behalf of the employee and that product shall be

---

[8] As part of this issue, Claimant repeats his contention that Schnoll was not the employer directly liable for the payment of compensation and, as a result, was not entitled to a pension offset. Claimant's Br. at 33-36. Because we have already rejected this aspect of Claimant's appeal, we do not address it further.

divided by 4.34. The result is the amount of the offset to be applied to the [WC] benefit on a weekly basis.

(d) If the employee receives the multi-employer pension benefit in a lump sum, the actuarial equivalent of the lump sum with respect to the annuity options (qualified joint and survivor annuity or life annuity) available at the time of the employee's receipt of the benefit shall be used as the basis for calculating the offset to the [WC] benefit. The ratio of the employer's contribution to the pension plan shall be multiplied by the monthly annuity value of the pension benefit. The result shall be divided by 4.34 to achieve the offset to the [WC] benefit on a weekly basis.

34 Pa. Code § 123.10.

Here, McKeogh testified he used 34 Pa. Code § 123.10 to calculate Schnoll's pension offset because multiple employers contributed to Claimant's pension. N.T., McKeogh Dep., 7/18/18, at 9-11. McKeogh explained he calculated the present value of Claimant's pension as $157,167.44. *Id.* at 11. He then determined Schnoll's contributions to Claimant's pension with interest, which totaled $54,860. *Id.* McKeogh divided Schnoll's contributions by the present value of Claimant's pension, resulting in 34.91%. *Id.* McKeogh took 34.91% of Claimant's monthly $1,014 pension payment, which produced a monthly offset of $353.99. *Id.* at 11-12. Divided by 4.34, which approximates the number of weeks in a month, McKeogh concluded Schnoll's weekly offset was $81.56. *Id.* at 12.

At the time of McKeogh's initial deposition on July 18, 2018, counsel for Claimant requested figures showing pension contributions by Schnoll and other employers with and without interest. N.T., McKeogh Dep., 7/18/18, at 13-14. McKeogh provided the figures via e-mail on July 23, 2018, including Schnoll's $54,860 in contributions with interest and total contributions of $96,035.69 with interest. *See* Ex. D-14. McKeogh participated in a supplemental deposition on

14

September 7, 2018, testifying he received the figures from Claimant's pension fund. N.T., McKeogh Dep., 9/7/18, at 11, 17-18. McKeogh agreed, with reservations, that dividing $54,860 by $96,035.69 would establish the percentage of pension contributions attributable to Schnoll "made pursuant to work [Claimant] worked in covered employment." *Id.* at 12-13.

The WCJ did not wholly accept McKeogh's calculations. In his July 29, 2019 decision, the WCJ addressed this issue as follows:

> This Judge has reviewed and considered the entire testimony of [] McKeogh. His testimony is accepted with respect to his calculation of those contributions made by [Schnoll] and the other employers to Claimant's union pension plan. This Judge finds, however, that the formula utilized in calculating [Schnoll's] pension offset is not accepted as credible because it does not rely upon the extent to which [Schnoll] funded Claimant's pension fund and that the calculation should be made by comparing [Schnoll's] pension fund contributions to those made by all of Claimant's employers while he worked as a commercial painter. In addition, the contributions should be calculated without interest. As a result, this Judge finds that based upon the contribution data [] McKeogh produced the calculation that measures the extent to which [Schnoll] contributed to the pension fund yields a percentage figure of 57.13 percent ($54,860.99 divided by $96,035.69 = .571256 x 100 = 57.13 percent). Accordingly, [Schnoll's] pension offset equals $133.47 per week ($1,014.00 x .571256 = $579.253857 ÷ 4.34 = 133.467).

WCJ Dec., 7/29/19, F.F. ¶ 25.[9]

Claimant does not demonstrate any error in the WCJ's reasoning. McKeogh determined Schnoll's contributions to Claimant's pension to be $54,860.99 with

---

[9] Claimant began receiving his pension effective March 1, 2011, which the WCJ used as the effective date for the offset. N.T., 6/19/14, at 78; WCJ Dec., 7/29/19, C.L. ¶ 3.

interest.[10] He then divided that figure by the plan's present value of $157,167.44, resulting in 34.91%. Rather than dividing by the plan's present value, the WCJ used the total contributions to Claimant's pension of $96,035.69, resulting in 57.13%. In other words, because Schnoll made 57.13% of the contributions to Claimant's pension, the WCJ determined it should receive a 57.13% offset. The WCJ recounted McKeogh's testimony during the supplemental deposition that this calculation accurately represents "the extent to which [Schnoll] made contributions . . . pursuant to work that Claimant worked in covered employment." WCJ Dec., 7/29/19, F.F. ¶ 15.

Further, the record supports the conclusion that McKeogh's $54,860.99 figure reflects contributions made by Schnoll and not Schnoll Painting. Granato described Schnoll Painting as an entity related to Schnoll that sometimes paid Claimant's wages, depending on "whatever company ha[d] the most cash" at the time. N.T., Granato Dep., 10/15/18, at 10, 16. He explained Schnoll "has all the management labor," directs the work to be done, and is the only company that signed the collective bargaining agreement with Claimant's union. *Id.* at 17-18. In contrast, "Schnoll Painting has nothing." *Id.* at 18. Granato acknowledged Claimant's Schnoll Painting paystubs included pension deductions. *Id.* at 16-17. He explained, despite this, that Schnoll Painting did not contribute to Claimant's pension:

> What was shown on his pay stubs would be his deductions, his union deductions, which is a very, very small percentage anyway of the total fringes that are paid on an hourly basis.

---

[10] Despite the WCJ's statement that "the contributions should be calculated without interest," WCJ Dec., 7/29/19, F.F. ¶ 25, he calculated Schnoll's pension benefit offset using McKeogh's "with interest" figures, Ex. D-14. Claimant does not question the WCJ's use of the "with interest," rather than "no interest" figures.

16

And they are paid on a union report. Regardless of what company paid the hours, all the hours are on [a Schnoll] union report and they are paid with [a Schnoll] check to the union.

. . . .

. . . At one point maybe, I am going to say it might be, like, five or six years ago, whatever, the union went to an online system where instead of checks, it gets debited directly from the account. And that is directly debited from [Schnoll's] account.

*Id.* at 11-12.[11]

Claimant's argument that Schnoll paid a maximum of $5,727.42, rather than $54,860.99, appears to be based on his own interpretation of a spreadsheet McKeogh discussed during the deposition on July 18, 2018. *See* Claimant's Br. at 35, 39; N.T., McKeogh Dep., 7/18/18, Ex. McKeogh-4. McKeogh later provided a "condensed" version of the spreadsheet to counsel for ease of review. N.T., 8/7/18, at 20; Ex. D-09 (A19-0760). According to Claimant, McKeogh misinterpreted the spreadsheet by "using the [p]ension [d]ue column, not using the pension paid column." Claimant's Br. at 39. McKeogh was unequivocal during his testimony that Schnoll's contributions to Claimant's pension totaled $54,860.99 with interest. *See* N.T., McKeogh Dep., 7/18/18, at 11; N.T., McKeogh Dep., 9/7/18, at 13; Ex. D-14. Moreover, interpretating McKeogh's spreadsheet in the way Claimant suggests would result in an offset that is less favorable to him than the WCJ's 57.13%.[12] For

---

[11] Similarly, Thurman testified Schnoll Painting would sometimes pay Claimant's wages due to "[c]ash flow," but Schnoll was the only entity that made contributions to Claimant's pension. N.T., Thurman Dep., 4/17/18, at 18-19.

[12] As Claimant argues, adding the contributions attributable to Schnoll in the "paid" columns would result in $5,727.42. Comparing this amount to the total contributions of $8,661.16 in the "paid" columns would result in an offset of 66.13%.

these reasons, we conclude the record contains substantial evidence in support of the WCJ's calculation of the pension offset, and we discern no error of law.

## C. Voluntary removal and earning power

In his third issue, Claimant argues he did not voluntarily remove himself from the workforce. Claimant emphasizes he receives Social Security Disability benefits and a disability pension, which, even when combined with his WC benefits, do not equal the wages he once earned as a union painter. Claimant's Br. at 40-42. Claimant relies on the totality of the circumstances, insisting he did not voluntarily remove himself from the workforce but was "stranded into disability by his work injury." *Id.* at 40-43. In his interrelated fourth issue, Claimant challenges the WCJ's finding that he has an earning power of $1,346 per week. Claimant argues he could not perform the jobs Smychynsky identified in the labor market survey because of physical limitations and a past felony conviction.[13] *Id.* at 49-50, 54-56. Claimant also asserts accepting the jobs would result in a loss of union benefits.[14] *Id.* at 46-

---

[13] Claimant's criminal docket sheets indicate he pled guilty to aggravated assault graded as a felony of the first degree on October 24, 1991. N.T., Claimant Dep., 1/9/18, Ex. England-3.

[14] Claimant challenges Smychynsky's February 11, 2013 labor market survey, finding an earning power of $520 per week, and November 12, 2016 labor market survey, finding an earning power of $1,346 per week, on the basis that accepting the identified jobs would result in a loss of union benefits. Claimant otherwise focuses his arguments on the November 12, 2016 labor market survey, which is where we direct our discussion and review of the evidence.

49. Claimant argues Schnoll had work available but failed to offer it to him.[15, 16] *Id.* at 40-42, 50-54.

In circumstances where a claimant is unable to perform a prior job due to a work injury, he or she must still be "open to employment within his or her physical capabilities in order to be entitled to benefits under the [Act]." *Philips Respironics v. Workers' Comp. Appeal Bd. (Mika)*, 232 A.3d 1019, 1021-22 (Pa. Cmwlth. 2020) (quoting *Cnty. of Allegheny v. Workers' Comp. Appeal Bd. (Weis)*, 872 A.2d 263, 266 (Pa. Cmwlth. 2005) (emphasis omitted)). Our Supreme Court has explained the requirements for establishing voluntary removal from the workforce:

> Where the employer challenges the entitlement to continuing compensation on grounds that the claimant has removed himself or herself from the general workforce by retiring, the employer has the burden of proving that the claimant has voluntarily left the workforce. There is no presumption of retirement arising from the fact that a claimant seeks or accepts a pension, much less a disability pension; rather, the worker's acceptance of a pension entitles the employer only to a permissive inference that the claimant has retired. Such an inference, if drawn, is not on its own sufficient evidence to establish that the worker has retired-the inference must be considered in the context of the totality of the circumstances. The factfinder must also evaluate all of the other relevant and credible evidence before concluding that the employer has carried its burden of proof.
>
> If the employer produces sufficient evidence to support a finding that the claimant has voluntarily left the workforce, then the burden shifts to the claimant to show that there in fact has been a compensable loss of earning power. Conversely, if the employer fails to present sufficient evidence to show that the claimant has retired, then the

---

[15] Claimant argues as part of his first and fourth issues that because Merion was the employer directly liable for the payment of compensation, rather than Schnoll, it was Merion's obligation to establish a job vacancy. Claimant's Br. at 32-33, 51-52. Because we have already rejected this aspect of Claimant's appeal, we do not address it further.

[16] Claimant suggests he did not have an adequate opportunity to testify regarding his voluntary removal from the workforce and earning power. Claimant's Br. at 43 n.11, 45 n.12.

employer must proceed as in any other case involving a proposed modification or suspension of benefits.

*City of Pittsburgh v. Workers' Comp. Appeal Bd. (Robinson)*, 67 A.3d 1194, 1209-10 (Pa. 2013).

Additionally, an employer may seek to modify WC benefits from total to partial disability by establishing the claimant's "earning power." *Whitfield v. Workers' Comp. Appeal Bd. (Tenet Health Sys. Hahnemann LLC)*, 188 A.3d 599, 612-13 (Pa. Cmwlth. 2018). An employer must either offer the claimant a job that he or she is capable of performing or "establish earning power through expert opinion evidence including job listings with employment agencies, agencies of the Department of Labor and Industry [(Department)], and advertisements in a claimant's usual area of employment." *S. Hills Health Sys. v. Workers' Comp. Appeal Bd. (Kiefer)*, 806 A.2d 962, 966 (Pa. Cmwlth. 2002) (quotation marks omitted). Section 306(b)(2) of the Act governs this determination:

> (2) "Earning power" shall be determined by the work the employe is capable of performing and shall be based upon expert opinion evidence which includes job listings with agencies of the [D]epartment, private job placement agencies and advertisements in the usual employment area. Disability partial in character shall apply if the employe is able to perform his previous work or can, considering the employe's residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employe lives within this Commonwealth. If the employe does not live in this Commonwealth, then the usual employment area where the injury occurred shall apply. If the employer has a specific job vacancy the employe is capable of performing, the employer shall offer such job to the employe. In order to accurately assess the earning power of the employe, the insurer may require the employe to submit to an interview by a vocational expert who is selected by the insurer and who meets the minimum qualifications established by the [D]epartment through regulation. The vocational expert shall comply with the Code of Professional Ethics for

20

Rehabilitation Counselors pertaining to the conduct of expert witnesses.

77 P.S. § 512(2).

The WCJ considered the totality of the circumstances and concluded Claimant voluntarily withdrew from workforce. WCJ Dec., 7/29/19, F.F. ¶ 30. The WCJ cited a lack of medical evidence that Claimant was totally disabled and Claimant's lack of effort to return to work despite his ability to do so. *Id.* The WCJ found no evidence that returning to work would endanger Claimant's union benefits, so long as he did not work for a business that competed with the union. *Id.* Further, the WCJ concluded Claimant had an earning power of $1,346 per week. *Id.* ¶ 35. The WCJ found Claimant was capable of performing the jobs Smychynsky identified in the labor market survey and observed Claimant appeared to be sabotaging his job search by calling potential employers and telling them "he was a 'convicted felon' with no indication that the crimes were in the past and he has since had a clean record." *Id.* ¶¶ 26, 29. Indeed, the WCJ found Claimant almost wholly incredible, describing his testimony on cross-examination as "combative and untruthful." *Id.* ¶ 29.

Substantial evidence supports the WCJ's findings and conclusions. Smychynsky opined Claimant had an earning power of $1,346 per week based on a November 12, 2016 labor market survey. N.T., Smychynsky Dep., 2/28/18, at 9-10, 56. Smychynsky identified 17 possible jobs, including sales, customer service, and assembly positions.[17] *Id.* at 10-13, Ex. Smychynsky-3. Smychynsky opined the identified jobs were available to and appropriate for Claimant within a reasonable degree of "vocational certainty," based on Claimant's education and administrative

---

[17] Smychynsky initially identified 19 possible jobs but agreed to eliminate 2 from consideration because they involved nonunion painting employers. N.T., Smychynsky Dep., 2/28/18, at 8-9.

experience. *Id.* at 11-17, 47. Smychynsky explained Claimant had an associate's degree in electrical engineering technology and a bachelor's degree in business administration, and had taken graduate-level courses in mathematics.[18] *Id.* at 12-13, 107. Smychynsky also noted Claimant coached and administered youth sports. *Id.* at 13-15. Regarding Claimant's criminal history, Smychynsky testified it was remote in time, involved charges in the early-to-mid 1990s, and, based on discussions with employers, would not disqualify Claimant from obtaining jobs identified in the labor market survey.[19] *Id.* at 18-24, 116.

Jeffrey Malumed, M.D. (Dr. Malumed) performed independent medical examinations of Claimant on November 20, 2014, and March 14, 2018, and opined Claimant was capable of returning to the workforce and performing the jobs Smychynsky identified. N.T., Malumed Dep., 5/14/18, at 10-11, 16-17, 25-28, 34-35. Based on the examination on November 20, 2014, Dr. Malumed opined Claimant could perform work requiring him to walk, sit, and lift 25 to 30 pounds. *Id.* at 17. Dr. Malumed did not believe Claimant was "capable of climbing unprotected heights on a regular basis or extensive squatting or kneeling-type activities." *Id.* By the time of the examination on March 14, 2018, Dr. Malumed opined Claimant could stand an entire day, as well as lift up to 35 pounds frequently and up to 50 pounds occasionally. *Id.* at 26, 29. Indeed, Dr. Malumed testified he

---

[18] Claimant explained he briefly enrolled in a teaching certificate program. N.T., Claimant Dep., 1/9/18, at 54.

[19] Claimant argues Smychynsky erroneously relied on "commission inflated car sales jobs" when opining Claimant had an earning power of $1,346 per week. Claimant's Br. at 55-56. Claimant argues he cannot obtain a car sales license because of his felony conviction. Claimant's Br. at 56. Contrary to Claimant's contention, state law generally requires an individualized assessment of applicants for licensure who have a criminal history. *See* 63 Pa.C.S. § 3113(b)-(c). This includes individuals who committed "crimes of violence" if the conviction was remote in time, among other conditions. 63 Pa.C.S. § 3113(e).

22

would approve work as a union painter if Claimant requested it, explaining Claimant was capable of "occasionally climbing ladders, occasionally squatting or kneeling on his knee." *Id.* at 25, 98-99. Dr. Malumed questioned Claimant's credibility during the second examination, explaining, in part, that Claimant "[r]efused to bend his back more than ten degrees with flexion, extension, rotation . . . that's ridiculous, that's someone who's back is fused. My wife's back is fused and she moves more than ten degrees." *Id.* at 23, 52, 95.

Claimant testified during his deposition on January 9, 2018, that he contacted nearly every potential employer Smychynsky identified. N.T., Claimant Dep., 1/9/18, at 25-26. Claimant insisted these jobs were not available to him because "when we go into the aspect of my background I was flat out told . . . [t]hey don't hire convicted felons." *Id.* at 26-27. Claimant explained the employers did not ask about his criminal history, but he "volunteer[ed] that information based on some of the job descriptions." *Id.* at 86-87. Regardless, Claimant testified he was not planning on returning to work and would "[p]robably" not accept any of the jobs, even if they were offered to him, "because it would affect my Social Security disability and my union pension, and all my benefits I receive from the union." *Id.* at 63, 87. Consistent with the WCJ's reasoning, our review of Claimant's testimony demonstrates he was combative and evasive in his answers. The following exchange with Schnoll's counsel demonstrates this point:

Q. Does your wife work still?

A. Yes, she does.

Q. What does she do?

A. She works for the Federal government.

Q. What does she do?

23

A. She works for the Federal government.

Q. I understand. What does she do for the Federal government, sir?

A. I have no clue.

Q. No idea.  Does she work on a full-time basis, sir?

A. Yes, she does.

Q. What's her salary per year?

[Claimant's counsel]: Objection, relevance.

[Claimant]: I'm definitely not answering that.  Move on.

[By Schnoll's counsel]:

Q. Do you know? Do you know?

A. I'm not answering it. Move on. My wife's salary has nothing to do with this court other than to harass me.

Q. You mentioned you don't even know what she does, do you know what she earns?

A. No, I don't.

*Id.* at 43-44.

With respect to Claimant's union benefits, this Court has explained that "an offer of a non-union position to a union claimant is unavailable as a matter of law only upon a showing that the acceptance of such an offer would result in a loss of union benefits or status." *Newhouse v. Workers' Comp. Appeal Bd. (PJ Dick/Trumbull Corp.)*, 803 A.2d 828, 831 (Pa. Cmwlth. 2002) (citing *ABF Freight Sys., Inc. v. Workers' Comp. Appeal Bd. (Iten)*, 744 A.2d 348 (Pa. Cmwlth. 2000)). In this case, Thurman explained he interacted with Claimant's union on a regular basis and was a trustee on its health and welfare board.  N.T., Thurman Dep., 9/16/14, at 14, 22-23.  Thurman described several Schnoll painters who worked

other jobs, including a painter who "worked at a commercial bakery" and others who delivered newspapers. *Id.* at 9. This did not cause any problems with Claimant's union, Thurman explained, because "[t]here's bylaws within the . . . agreement that state that the only issue would come in when they're competing against union painting business." *Id.* at 9-10.

Claimant challenges the competency of Thurman's testimony and cites his union's Welfare Fund Summary Plan description, arguing he would no longer be an "active participant" in the plan if he worked in a position not covered by the union's collective bargaining agreement. Claimant's Br. at 46-48; Claimant's Reply Br. at 11-16. However, our review indicates Claimant would have already lost his status as an active participant in the plan when he became injured and stopped working as a union painter. *See* Ex. C-36, Section 2, at 7 ("For Active Participants. Your coverage ends on the first of the following: . . . if you stop seeking work on a daily basis with employers who have collective bargaining agreements with [Claimant's union.]") (emphasis omitted); *id.* at 3 ("In order to maintain eligibility under the [p]lan, you must work the number of hours outlined according to the following schedules.").

Claimant also suggests he would have been unable to qualify for or retain his disability pension and associated healthcare benefits if he accepted a job outside the union. Claimant's Br. at 47-48. Claimant is only entitled to receive his disability pension so long as he remains disabled as determined by the Social Security Administration. *See* Ex. C-35, at 24-26 (members are "ONLY considered totally and permanently disabled if [they] have been determined by the Social Security Administration to be entitled to Social Security total and permanent disability benefits" and the "right to [d]isability [r]etirement [b]enefit payments stops on

recovery from total and permanent disability"). The purpose of the pension is not to provide benefits to individuals who are capable of gainful employment. Thus, we agree with the WCJ that the loss of Claimant's pension is "a purely financial calculation and not a valid reason not to return to the workforce." WCJ Dec., 7/29/19, F.F. ¶ 30.

Regarding specific job vacancies, an employer does not bear the initial burden of proving the nonexistence of a vacancy during the relevant time period.[20] *Reichert v. Workers' Comp. Appeal Bd. (Dollar Tree Stores/Dollar Express & Specialty Risk Servs., Inc.)*, 80 A.3d 824, 829 (Pa. Cmwlth. 2013) (citing *Rosenberg v. Workers' Comp. Appeal Bd. (Pike Cnty.)*, 942 A.2d 245, 251 (Pa. Cmwlth. 2008) (*en banc*); *Kleinhagan v. Workers' Comp. Appeal Bd. (KNIF Flexpak Corp.)*, 993 A.2d 1269, 1275 (Pa. Cmwlth. 2010)). "Rather, a claimant may present evidence that [d]uring the period in which the employer . . . had a duty to offer a specific job, the employer had a specific job vacancy that it intended to fill that the claimant was capable of performing. The burden then shifts to the employer to rebut the claimant's evidence." *Id.* at 829-30 (citations and quotation marks omitted).

---

[20] The pertinent regulation provides:

> The employer's obligation to offer a specific job vacancy to the employee commences when the insurer provides the notice [of ability to return to work] to the employee required by [S]ection 306(b)(3) of the [A]ct[, 77 P.S. § 512(b)(3),] and shall continue for 30 days or until the filing of a Petition for Modification or Suspension, whichever is longer. When an insurer files a Petition for Modification or Suspension which is not based upon a change in medical condition, the employer's obligation to offer a specific job vacancy commences at least 30 days prior to the filing of the petition.

34 Pa. Code § 123.301(b). In this case, a notice of ability to return to work was issued on December 2, 2014, based on Dr. Malumed's November 20, 2014 examination, and Schnoll filed the modification petition at issue on November 15, 2016.

Claimant alleged during his testimony that Schnoll had job vacancies that should have been available to him. N.T., Claimant Dep., 1/9/18, at 27-29, 72-84. Although Thurman testified regarding multiple hirings and job vacancies, he asserted Schnoll did not have any specific vacancies within Claimant's vocational abilities and medical restrictions.[21] N.T., Thurman Dep., 4/17/18, at 12-15. Thurman acknowledged Schnoll hired several individuals who worked as "project managers/estimators" and as a superintendent, but he explained those individuals did not fill specific job vacancies within the company. *Id.* at 13-15, 46. Thurman also contrasted those individuals with Claimant based on qualifications, explaining Claimant "has no book of business, he has no experience of estimating and/or project management." *Id.* at 16, 44-46. Thurman acknowledged one specific job vacancy as a project manager/estimator but testified once again that Claimant was not qualified "because he has no background in this business as far as administrative work and project managing." *Id.* at 16-17, 42-43. Thurman testified regarding a specific job vacancy as an administrative assistant, which he did not believe Claimant had the appropriate skills to perform, such as the ability to take dictation and type.[22] *Id.* at 16-17, 43.

It is important to reiterate that the WCJ is the fact-finder in this case and is entitled to weigh the evidence and assess the credibility of witnesses. *See Montano*, 278 A.3d at 978 n.4. Moreover, we must view the evidence in the light most favorable to the party that prevailed before the WCJ and draw all reasonable

---

[21] Thurman acknowledged Schnoll hires painters "every day" but testified with the caveat that Dr. Malumed had not cleared Claimant to return to painting between December 2, 2014, and November 2, 2016. N.T., Thurman Dep., 4/17/18, at 12-13, 38.

[22] Thurman added that Claimant lacked interpersonal skills, explaining he had "been dismissed from this company on more than one occasion because he can't cooperate with people." N.T., Thurman Dep., 4/17/18, at 44.

inferences in support of the WCJ's decision. *Id.*; *see also Williams v. City of Phila. (Workers' Comp. Appeal Bd.)*, 312 A.3d 976, 984-85 (Pa. Cmwlth. 2024) (citing *Verizon Pa. Inc. v. Workers' Comp. Appeal Bd. (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015)). Given these principles, and our discussion above, we have no basis to disturb the WCJ's conclusions that Claimant voluntarily removed himself from the workforce as of January 9, 2018, and had an earnings capacity of $1,346 per week as of November 12, 2016.

**D. Reasoned decision, unreasonable contest, and penalties**

Claimant's final issue is a combination of several sub-issues. Claimant argues the WCJ failed to issue a reasoned decision. Claimant contends the WCJ failed to (1) adequately explain how Merion was not his statutory employer, (2) "address the CCIP plan documents," (3) address his valuable union benefits and the loss of those benefits if he accepted a job, (4) reconcile conflicting testimony offered by Smychynsky and Thurman "regarding Claimant's residual vocational abilities," and (5) explain his pension offset calculation, which contradicted McKeogh's testimony. Claimant's Br. at 57. Claimant contends Schnoll's contest of this case was unreasonable, and he is entitled to attorney's fees, because "SeaBright concealed the CCIP," and Schnoll failed to comply with discovery. *Id.* at 59-60. Finally, Claimant argues the WCJ should have granted his penalty petition. *Id.* at 60. Claimant proposes he is entitled to penalties because Schnoll took a unilateral pension credit, despite knowing the credit was incorrect, and failed to comply with discovery and subpoenas. *Id.*

Section 422(a) of the Act directs, in relevant part, that "parties to an adjudicatory proceeding are entitled to a reasoned decision . . . which clearly and concisely states and explains the rationale for the decisions so that all can determine

why and how a particular result was reached." 77 P.S. § 834. The Pennsylvania Supreme Court has explained a WCJ's decision is sufficiently "reasoned" under Section 422(a) "if it allows for adequate review by the [Board] without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052 (Pa. 2003).

Under Section 440(a) of the Act,[23] an employee in whose favor any contested case is finally determined in whole or in part shall be awarded, in addition to WC benefits, "a reasonable sum for costs incurred for attorney's fee, witnesses, necessary medical examination, and the value of unreimbursed lost time to attend the proceedings[.]" 77 P.S. § 996(a). However, "[t]hat cost for attorney fees may be excluded when a reasonable basis for the contest has been established by the employer or the insurer." *Id.* It is within the WCJ's discretion to grant or refuse an award of attorney's fees when there is a reasonable basis for the contest. *Torres v. Amazon.com Servs. LLC (Workers' Comp. Appeal Bd.)*, 313 A.3d 486, 491 (Pa. Cmwlth. 2024) (citing *Lorino v. Workers' Comp. Appeal Bd. (Cmwlth. of Pa.)*, 266 A.3d 487, 494 (Pa. 2021)).

Further, Section 435(d) of the Act[24] provides for the imposition of penalties based on "violations of the provisions of th[e A]ct or . . . rules and regulations or rules of procedure[.]" 77 P.S. § 991(d). A claimant initially bears the burden of establishing his or her employer violated the act or regulations, after which the burden shifts to the employer to establish that no violation has occurred. *Bennett v. Jeld Wen, Inc. (Workers' Comp. Appeal Bd.)*, 306 A.3d 949, 958-59 (Pa. Cmwlth.

---

[23] Added by Section 3 of the Act of February 8, 1972, P.L. 25.

[24] Added by Section 3 of the Act of February 8, 1972, P.L. 25.

2023) (citing *Shuster v. Workers' Comp. Appeal Bd. (Pa. Hum. Rels. Comm'n)*, 745 A.2d 1282, 1288 (Pa. Cmwlth. 2000)). "Even if a violation of the Act or the regulations is established, the imposition of a penalty is not mandatory but falls within the discretion of the fact[-]finder." *Id.* at 959 (citing *Candito v. Workers' Comp. Appeal Bd. (City of Phila.)*, 785 A.2d 1106, 1108 (Pa. Cmwlth. 2001)).

The WCJ issued decisions in this case on December 1, 2016, July 29, 2019, and August 26, 2019, which carefully and thoughtfully explained the bases for his findings of fact and conclusions of law. The WCJ's decisions allowed for "adequate review" by this Court and complied with Section 422(a). *See Daniels*, 828 A.2d at 1052. Given our discussion above, finding no merit to the issues on appeal, Claimant is not entitled to attorney's fees beyond the $1,291.50 the WCJ already awarded in the December 1, 2016 and August 26, 2019 decisions, based on Claimant's partly successful review petition. *See* 77 P.S. § 996(a). Finally, Schnoll was entitled to a pension offset, our review of the record does not indicate Claimant filed a penalty petition alleging discovery violations, and the limited legal authority Claimant cites does not demonstrate he was entitled to the documents he requested. *See* Claimant's Br. at 39 n.9, 52, 59-60; Claimant's Reply Br. at 17-18, 22. We see no basis to conclude the WCJ abused his discretion by declining to award penalties. *See Bennett*, 306 A.3d at 959.

## CONCLUSION

Our review of the certified record and the relevant law supports the WCJ's conclusions that (1) Schnoll was the employer directly liable for the payment of compensation, (2) Schnoll was entitled to a pension offset in the amount of $133.47 per week as of March 1, 2011, (3) Claimant had an earning power of $1,346 per week as of November 12, 2016, and (4) Claimant voluntarily withdrew from the

30

workforce as of January 9, 2018. We also reject Claimant's arguments that the WCJ failed to issue a reasoned decision, and that he was entitled to attorney's fees and penalties. Therefore, we affirm the Board's February 19, 2021 order, which in turn affirmed the WCJ's July 29, 2019, and August 26, 2019 decisions.

_____
STACY WALLACE, Judge

Judge Covey did not participate in the decision of this case.

31

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas A. England,               : **CASES CONSOLIDATED**
                   Petitioner   :
                                     :
         v.                         :
                                       :
Merion Construction, M. Schnoll &     :
Sons, Schnoll Painting, SeaBright     :
Insurance and New Hampshire       :
Insurance (Workers' Compensation   : No.  304 C.D. 2021
Appeal Board),                    : No.  305 C.D. 2021
             Respondents : 

# **O R D E R**

    **AND NOW**, this 7th day of August 2024, the February 19, 2021 order of the

Workers' Compensation Appeal Board is **AFFIRMED**.


                                      _____
                                       STACY WALLACE, Judge